1 | Nancy E. Wolff, Esq., No. 133334
2 | nwolff@cdas.com
3 | COWAN, DeBAETS, ABRAHAMS, & SHEPPARD LLP
4 | 8447 Wilshire Boulevard, Suite 425
5 | Beverly Hills, CA 90211
  | Telephone: (310) 340-6334
6 | Telefax: (310) 492-4394
  | NWolff@cdas.com

*Attorneys for Plaintiffs*
NORTH STAR MEDIA, LLC &
THE HENRY S. & MALA DORFMAN FAMILY FOUNDATION

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NORTH STAR MEDIA, LLC, a Michigan limited liability company, and THE HENRY S. & MALA DORFMAN FAMILY FOUNDATION, a Michigan nonprofit corporation,<br><br>           Plaintiffs,<br><br>vs.<br><br>10 LIVES CONTENT, LLC, a California limited liability company, DANIEL E. CATULLO, III, an individual, and DAVID KERNAN, an individual,<br><br>           Defendants. | Case No.: 2:25-cv-07064<br><br>**COMPLAINT FOR:**<br><br>   (1) Breach of Contract<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT AGAINST 10 LIVES CONTENT, LLC, ET AL.

North Star Media, LLC ("North Star") and the Henry S. & Mala Dorfman Family Foundation ("Foundation"; together with North Star, "Plaintiffs"), by their undersigned attorneys Cowan, DeBaets, Abrahams & Sheppard LLP, hereby submit their complaint against defendants 10 Lives Content, LLC ("10 Lives"), Daniel E. Catullo, III ("Catullo"), and David Kernan ("Kernan"; together with Catullo and 10 Lives, "Defendants"), as follows:

## NATURE OF THE ACTION

1. This is a simple case of breach of contract where Defendants promised to repay Plaintiffs' investment in their film and do not dispute that they failed to pay it back pursuant to the applicable contract.

2. Plaintiffs each entered into nearly identical co-production/financing agreements with 10 Lives wherein they agreed to invest money to assist with the production of a motion picture and 10 Lives agreed to repay that money (plus return on investment) by a date certain.

3. The Co-Production/Financing Agreement fully executed as of August 14, 2024, between 10 Lives and the Foundation is referred to herein as the "Foundation Production Agreement." A true and correct copy of the Foundation Production Agreement is attached hereto as Exhibit A.

4. The Amended and Restated Co-Production/Financing Agreement fully executed as of October 8, 2024, between 10 Lives and North Star is referred to herein as the "North Star Production Agreement." A true and correct copy of the North Star Production Agreement is attached hereto as Exhibit B.

5. Collectively, the two aforementioned agreements will be referred to as the "Production Agreements."

6. Catullo and Kernan agreed to personally guarantee the timely repayment of Plaintiffs' investments. They both executed a "Personal Guarantee to Executive

Producer" attached as Exhibit E to both the Foundation Production Agreement and the North Star Production Agreement (the "Personal Guarantees").

7. Repayment of Plaintiffs by the agreed-upon date (as guaranteed by Catullo and Kernan) was not conditioned on or contingent upon any milestone relating to the film, the production schedule, the release schedule, or anything else.

8. The contractual deadline came and went without repayment. Several times Plaintiffs requested that payment be made, and Defendants brushed off the request as if their contractual obligations were merely optional, or that Defendants were asking for something extraordinary.

9. Defendants are in material breach of their contractual obligations and owe Plaintiffs their money, return on investment, pre-judgment interest, costs, and attorney's fees.

## THE PARTIES

10. North Star is a limited liability company organized in Michigan with its principal place of business in Michigan. It is a Detroit-based music publishing and synchronization licensing company which, since 2001, has secured thousands of music placements in film, television, advertising, and video games.

11. North Star's sole member is North Star Partners, LLC, another Michigan LLC. Its members, in turn, consist of six individuals (four from Michigan and two from New Jersey), and eight trusts (all located in Michigan).

12. The Foundation is a Michigan 501(c)(3) nonprofit corporation headquartered in Bloomfield Hills, Michigan. It is a private foundation that awards grants to various charities in the arts, education, religious, and medical fields.

13. 10 Lives is a California limited liability company with its principal place of business in Santa Monica, California. It is a production company specializing in live concert films and documentaries.

14. Upon information and belief, 10 Lives' members are exclusively, if not primarily from California, and to the extent they are not from California, upon information and belief, they are from Tennessee.

15. Upon information and belief, 10 Lives has no members from Michigan or New Jersey.

16. Catullo is an individual domiciled in Coto de Caza, California. He is the writer, director, and producer of the film at issue here.

17. Kernan is an individual domiciled in Newport Beach, California. Upon information and belief, Kernan is an investor and/or business partner of Catullo and 10 Lives in connection with the film at issue here and is a producer thereof.

## JURISDICTION AND VENUE

18. Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiffs and Defendants as detailed above and the amount in controversy exceeds $75,000 exclusive of interest and costs.

19. This Court has personal jurisdiction over 10 Lives because 10 Lives is a California LLC organized and existing under the laws of California. It is licensed to do business in California, and is headquartered in Santa Monica, California. Further, a substantial portion of the conduct at issue occurred in this judicial district.

20. 10 Lives is also subject to jurisdiction in this Court because, pursuant to ¶ 21(e) of both the Foundation Production Agreement and the North Star Production Agreement, the parties "consent to and submit to jurisdiction of a competent court located in the State of California, County of Los Angeles," and 10 Lives "irrevocably waives, to the fullest extent permitted by law, any objection, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect to any such transaction."

21. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as to 10 Lives because a substantial part of the events or omissions by 10 Lives giving rise to Plaintiffs' claims occurred in this judicial district.

22. Venue is also proper in this Court as to 10 Lives because, pursuant to both the Foundation Production Agreement and the North Star Production Agreement, the parties agreed that "a competent court located in the State of California, County of Los Angeles . . . shall be the sole and exclusive venue for resolution of any disputes or disagreements between the Parties relating to this Agreement or the transactions contemplated hereby or otherwise arising hereunder or with respect to any breach of the terms and provisions hereof."

23. Catullo is subject to jurisdiction in this Court because he is domiciled in this District, in Coto de Caza, California. Further, a substantial portion of the conduct at issue occurred in this judicial district.

24. Kernan is subject to jurisdiction in this Court because he is domiciled in this District, in Newport Beach, California. Further, a substantial portion of the conduct at issue occurred in this judicial district.

25. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as to both Catullo and Kernan because a substantial part of the events or omissions by Catullo and Kernan giving rise to Plaintiffs' claims occurred in this judicial district.

26. Catullo and Kernan are also subject to jurisdiction and venue in this Court because they agreed to the following provision located in ¶ 4(e) of the Personal Guarantees appended as Exhibit E to both Production Agreements:

> EACH OF EXECUTIVE PRODUCER, GUARANTORS AGREES THAT ANY AND ALL ACTIONS TO INTERPRET OR ENFORCE THE PROVISIONS OF THIS AGREEMENT AND ANY OTHER DOCUMENTS REFERRED TO IN THIS AGREEMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF CALIFORNIA. EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION

OF SUCH COURTS, AND IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, AS A DEFENSE IN ANY ACTION, SUIT OR PROCEEDING FOR THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT OR SUCH OTHER DOCUMENT THAT IT IS NOT SUBJECT THERETO OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SAID COURTS OR THAT THE VENUE THEREOF MAY NOT BE APPROPRIATE OR THAT THIS AGREEMENT OR ANY SUCH OTHER DOCUMENT MAY NOT BE ENFORCED IN OR BY SAID COURTS. EACH OF EXECUTIVE PRODUCER, GUARANTORS AND EXECUTIVE PRODUCER HEREBY CONSENT TO AND GRANT ANY SUCH COURT JURISDICTION OVER THE PERSON OF SUCH PARTIES AND OVER THE SUBJECT MATTER OF ANY SUCH DISPUTE AND AGREES THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING IN THE MANNER PROVIDED , OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF.

## INTRADISTRICT ASSIGNMENT

27. This action should be assigned to the Los Angeles Division, because this action primarily arises in Los Angeles County and the parties have agreed to venue in Los Angeles County.

## FACTS

28. Plaintiffs entered into the Production Agreements with 10 Lives to produce a documentary film then called "Lost Sons, Found Purpose," later retitled to "Protect the House" (the "Picture").

29. Specifically, Plaintiffs' contributions to the financing of the Picture were to be used for "financing of final production and post-production of the Picture . . . and finishing on the Picture," as 10 Lives had represented that, at the time of execution of the Production Agreements, it had "obtained financing to cover principal photography and is currently seeking fund [sic] to continue post-production for the Picture." (Exhibits A & B, ¶¶ 1-2).

30. Per ¶ 6 of the Foundation Production Agreement, the Foundation invested $110,000 to "be used for finalizing principal photography, continuing post-production, paying fees associated with doing so and retaining the key team members." (Ex. A ¶ 6).

31. Per ¶ 6 of the North Star Production Agreement, North Star invested $185,000 to "be used for finalizing principal photography, continuing post-production, paying fees associated with doing so and retaining the key team members." (Ex. B ¶ 6).

32. Paragraph 7 of the Foundation Production Agreement states as follows:

> DEFAULT / GUARANTEE: If Executive Producer does not receive a return of their initial $110,000 investment by May 15, 2025, Company shall pay Executive Producer the difference of what is owed up to $110,000. Daniel E Catullo and David Kernan, joint and severally, guarantee that Executive Producer receives their full $110,000 back by May 15, 2024– see "Exhibit E - Personal Guaranty." (Ex. A ¶ 7).

33. Paragraph 7 of the North Star Production Agreement states as follows:

> DEFAULT / GUARANTEE: If Executive Producer does not receive a return of their initial $185,000 investment by May 15, 2025, Company shall pay Executive Producer the difference of what is owed up to $185,000. Daniel E Catullo and David Kernan, joint and severally, guarantee that Executive Producer receives their full $185,000 back by May 15, 2024– see "Exhibit E - Personal Guaranty."

34. Both versions of ¶ 7 in the Production Agreements erroneously list May 15, 2024, rather than May 15, 2025, in the second sentence of the paragraph.

35. Paragraph 8 of the Foundation Production Agreement includes a waterfall provisions titled "RETURN OF INVESTMENT," that provides that the Foundation and North Star, along with other "finishing Producers" will be the first to "recoup and receive a return on the Investment from Gross Receipts" in the form of "100% of all gross receipts on a pro-rata share with the other Producers, up to $385,000." (Ex. A ¶ 8(a)(i)). After recoupment of the second position parties, the Foundation and North Star

would both receive 5% of "all remaining funds and future revenues from any source." (*Id.* ¶ 8(a)(iii)).

36. Paragraph 8 of the North Star Production Agreement includes a waterfall provisions titled "RETURN OF INVESTMENT," that provides that the Foundation and North Star, along with other "finishing Producers" will be the first to "recoup and receive a return on the Investment from Gross Receipts" in the form of "100% of all gross receipts on a pro-rata share with the other Producers, up to $445,000." (Ex. B ¶ 8(a)(i)). After recoupment of the second position parties, North Star would receive 11.5% and the Foundation would receive 5% of "all remaining funds and future revenues from any source." (*Id.* ¶ 8(a)(iii)).

37. Each of the Production Agreements contains as "Exhibit E," a nearly identical Personal Guarantee executed by both Catullo and Kernan.

38. The Personal Guarantee appended to the Foundation Production Agreement states, in relevant part, as follows:

   a. "In consideration of and to induce Executive Producer to enter into the Agreement, Guarantors jointly and severally agree to absolutely and unconditionally guarantee (i) repayment of Executive Producer's investment of $110,000.00 in accordance with Paragraph 7 of the Agreement and (ii) all actual costs associated with enforcing this Guaranty, including any legal costs and attorney fees." (Ex. A at 20, recital B).

   b. "It is a condition precedent to Executive Producer's willingness to extend the financial accommodations reflected in the Agreement that Guarantors absolutely and unconditionally guaranty the indebtedness, obligations and liabilities under the Agreement and all related agreements, of whatever kind or nature, whether or not such obligations are contemplated at the time of this Agreement, whether such

obligations be direct or indirect, absolute or contingent or due or to become due (all of which obligations, indebtedness and liabilities are hereinafter sometimes referred to as 'Obligations,' which term shall include all expenses, including reasonable attorneys' fees, incurred or paid by Executive Producer in exercising, preserving, defending, enforcing or protecting any of its rights in connection with the Obligations hereunder)." (Ex. A at 20, recital c).

39. The Personal Guarantee appended to the North Star Production Agreement states, in relevant part, as follows:

 a. "In consideration of and to induce Executive Producer to enter into the Agreement, Guarantors jointly and severally agree to absolutely and unconditionally guarantee (i) repayment of Executive Producer's investment of $185,000.00 in accordance with Paragraph 7 of the Agreement and (ii) all actual costs associated with enforcing this Guaranty, including any legal costs and attorney fees." (Ex. B at 20, recital B).

 b. "It is a condition precedent to Executive Producer's willingness to extend the financial accommodations reflected in the Agreement that Guarantors absolutely and unconditionally guaranty the indebtedness, obligations and liabilities under the Agreement and all related agreements, of whatever kind or nature, whether or not such obligations are contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due (all of which obligations, indebtedness and liabilities are hereinafter sometimes referred to as 'Obligations,' which term shall include all expenses, including reasonable attorneys' fees, incurred or paid by Executive Producer in exercising, preserving, defending,

enforcing or protecting any of its rights in connection with the Obligations hereunder)." (Ex. B at 20, recital C).

40. Both Personal Guarantees, in ¶ 1 thereof, incorporate by reference the recitals set forth above. (*See* Exs. A & B at 20, ¶ 1).

41. Both Personal Guarantees, in ¶ 2 thereof, define "Even of Default" to mean any one or more of the following: "(a) Guarantors shall fail to pay any Obligations [defined above] in accordance with their terms; (b) There shall be a default under the [Production] Agreement or related agreements; or (c) Guarantors shall breach any term or provision of this Guaranty." (*See* Exs. A & B at 20-21, ¶ 2).

42. Both Personal Guarantees, in ¶ 3 thereof (a clause titled "Remedies") state that "[u]pon the occurrence of an Event of Default, Executive Producer may declare all sums due under the Agreement and/or Guaranty to be immediately due and payable by Guarantors." (*See* Exs. A & B at 21, ¶ 3).

43. Nothing in the Production Agreements or Personal Guarantees conditioned repayment of Plaintiffs' respective investments on any specific occurrence or milestone other than the arrival of the date certain of May 15, 2025.

44. On May 12, 2025, Catullo stated in an email to the principal of North Star and the Foundation, Jordan Dorfman, that "the 15th may be tough, but we should be able to pay it within days of that." North Star agreed that a few days' grace period would be acceptable.

45. On May 30, 2025, Catullo sent another email to Mr. Dorfman implying that it did not have the money to pay back the investments and was attempting to raise funds.

46. On June 4, 2024, Mr. Dorfman, on behalf of North Star and the Foundation wrote to Catullo and Kernan that interest would begin accruing because "the repayment obligation is in default."

47. As of June 16, 2024, none of the Defendants had responded, and Mr. Dorfman, on behalf of Plaintiffs, followed up again with Defendants noting that "10 Lives and you both individually have now been in default of our agreement for over 30 days" and as such "this letter shall serve as a formal demand on behalf of North Star Media and our Family Foundation for payment in full, of $185K and $110K respectively, by no later than two weeks from today (Monday, June 30th)."

48. On June 20, 2025, Catullo responded, acknowledging that "this [the repayment] is late," but attempted to distract from the issue by detailing various funding sources Defendants were pursuing, later claiming that Defendants' failure to repay the guaranteed amounts owed was "really not an issue."

49. Defendants' failure to abide by their contractual obligations, of course was, and is "an issue," and Defendants are now admittedly in material breach of the Production Agreements and the accompanying Personal Guarantees.

50. While Exhibit C to the Production Agreements ("Risk Factors") states that there is no guarantee of a "substantial return or any return at all of amounts provided to Company hereunder," this language does not bar recovery here because it conflicts with ¶¶ 7 and 8 of the Production Agreements, and per ¶ 21(n)(vi), "in the event of a conflict, the terms of this Agreement shall govern the terms of the Exhibits." Moreover, the Personal Guarantees incorporate the terms of the Production Agreements by way of per ¶ 4(c) thereof, which states that the Personal Guarantees, *together with the Production Agreements* "constitute[] the entire agreement and supersede[] all prior agreements and understandings." (Exs. A & B at 21, ¶ 4(c)).

//
//
//
//
//
//
//

# CLAIMS FOR RELIEF

# COUNT I

# BREACH OF CONTRACT – PRODUCTION AGREEMENTS

## (10 Lives)

51. Plaintiffs incorporate the previous allegations of its Complaint as if restated herein.

52. The Production Agreements are valid and binding contracts supported by adequate consideration that, upon information and belief, were negotiated by sophisticated parties represented by competent counsel.

53. Plaintiffs have fully performed under their respective Production Agreements and are not, and have never been, in breach thereof.

54. 10 Lives materially breached ¶¶ 7 & 8 of both Production Agreements by failing to return Plaintiffs' respective investments by May 15, 2025 (or even through the date of this filing) despite adequate notice and opportunity to cure.

55. 10 Lives has no valid legal excuse for non-performance and is therefore in material breach of the Production Agreements.

56. The Foundation has been damaged in an amount no less than $110,000, plus anticipated return on investment, consequential damages in the form of lost investment gains, pre-judgment interest, and costs and attorney's fees (which ¶ 21(g) of the Foundation Production Agreement provides shall be recoverable by the prevailing party from the losing party in a lawsuit relating to the Foundation Production Agreement).

57. North Star has been damaged in an amount no less than $185,000, plus anticipated return on investment, consequential damages in the form of lost investment gains, pre-judgment interest, and costs and attorney's fees (which ¶ 21(g) of the North Star Production Agreement provides shall be recoverable by the prevailing party from the losing party in a lawsuit relating to the Foundation Production Agreement).

58. Consequential damages are appropriate because it would have been reasonably foreseeable for Defendants to assume or understand that the money Plaintiffs invested in the Picture would have, at a minimum, been otherwise invested in the market generally.

## COUNT II

## BREACH OF CONTRACT – PERSONAL GUARANTEES

### (Catullo & Kernan)

59. Plaintiffs incorporate the previous allegations of its Complaint as if restated herein.

60. The Personal Guarantees are valid and binding contracts supported by adequate consideration that, upon information and belief, were negotiated by sophisticated parties represented by competent counsel.

61. Plaintiffs have fully performed under their respective Production Agreements and are not, and have never been, in breach thereof. Plaintiffs do not have affirmative obligations under the Personal Guarantees and therefore cannot be in breach thereof.

62. Both Catullo and Kernan materially breached their respective Personal Guarantees by failing to return Plaintiffs' respective investments by May 15, 2025 (or even through the date of this filing) despite adequate notice and opportunity to cure.

63. Neither Catullo nor Kernan has any valid excuse for non-performance and are therefore in material breach of the Production Agreements.

64. The Foundation has been damaged in an amount no less than $110,000, plus anticipated return on investment, consequential damages in the form of lost investment gains, pre-judgment interest, and costs and attorney's fees (which ¶ 21(g) of the Foundation Production Agreement provides shall be recoverable by the prevailing party from the losing party in a lawsuit relating to the Foundation Production

1 Agreement, and which is incorporated into the Personal Guarantees by way of ¶ 4(c) of the Personal Guarantees).

65. North Star has been damaged in an amount no less than $185,000, plus anticipated return on investment, pre-judgment interest, consequential damages in the form of lost investment gains, and costs and attorney's fees (which ¶ 21(g) of the North Star Production Agreement provides shall be recoverable by the prevailing party from the losing party in a lawsuit relating to the Foundation Production Agreement, and which is incorporated into the Personal Guarantees by way of ¶ 4(c) of the Personal Guarantees).

66. Consequential damages are appropriate because it would have been reasonably foreseeable for Defendants to assume or understand that the money Plaintiffs invested in the Picture would have, at a minimum, been otherwise invested in the market generally.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that they be awarded judgment as follows:

    a. Finding 10 Lives in material breach of the Production Agreements as set forth above;

    b. Finding Catullo in material breach of the Personal Guarantees as set forth above;

    c. Finding Kernan in material breach of the Personal Guarantees as set forth above;

    d. Awarding Plaintiffs damages of no less than the following amounts in compensatory damages:

        i. As to the Foundation, $110,000.00

        ii. As to North Star, $185,000.00

    e. Ordering 10 Lives to pay Plaintiffs any additional amounts that are

due at the time of judgment under ¶¶ 8(a)(iii) of the Production Agreements and further ordering specific performance by 10 Lives to continue to comply with its obligations under ¶¶ 8(a)(iii) of the Production Agreements (and for Catullo and Kernan to continue with their obligations under the Personal Guarantees, as appropriate) and pay such amounts to Plaintiffs in the future as they become due;

   f. Awarding Plaintiffs consequential damages in an amount to be determined at trial, but in no event less than $22,626.50, and upwards of $30,650.50, given that the $295,000 Defendants failed to repay had been removed from Plaintiffs' investment accounts, and since May 15, 2025, the S&P 500 has increased by 7.67% and the NASDAQ has increased by 10.39%.

   g. Awarding Plaintiffs their reasonable costs and attorney's fees associated with this litigation; and

   h. Ordering any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Dated:  July 31, 2025

        **COWAN DEBAETS ABRAHAMS & SHEPPARD, LLP**

        By: /s/Nancy E. Wolff
        Nancy E. Wolff, Esq.
        Scott J. Sholder, Esq.
        (*pro hac vice forthcoming*)

        *Attorneys for Plaintiffs*
        NORTH STAR MEDIA, LLC &
        THE HENRY S. & MALA DORFMAN FAMILY FOUNDATION